## PATTON et al, *v.* THE CITIES OF PHILADELPHIA AND NEW ORLEANS.

A marriage *per verba de futuro cum copulâ* has all the legal effects of a marriage *per verba de præsenti.*

In the interpretation of a marriage contract executed before the commandant of a Spanish fort, acting as a notary public, as far back as the year 1799, the understanding of the parties interested and the intentions of the officer, will be regarded, rather than the form and words of the instrument.

It is no objection to the validity of a contract of marriage passed before the commandant of a post under the Spanish colonial government, that the act was executed before him while acting as a notary public. Such was the usual style of all civil acts authenticated by those officers, except the putting in possession of land under orders of survey.

Though the heirship of plaintiffs be not put at issue by the answer, yet if they introduce evidence to prove their legitimacy, defendants may rebut the evidence and disprove it.

A marriage evidenced by an act passed before the commandant of a fort in a Spanish colony, acting as a notary public, the act reciting that it was executed before the officer in conformity with a custom sanctioned by the government on account of the want of spiritual assistance, and that the marriage is to be solemnized before the church on the first opportunity, is valid. Such marriages were included by the canon law, with other informal and secret

marriages, under the general appellation of *clandestina matrimonia*, and their validity was expressly recognized by the Council of Trent. Sess. 24, ch. 1. The declaration of the commandant that he was authorized by the government to celebrate the marriage, is sufficient evidence of the fact. His authority must be presumed. It could only be questioned by his superiors. Such a marriage could not be invalidated by the subsequent refusal of the husband to solemnize it before a priest. It was valid without any such solemnization.

The adoption of the decrees of the Council of Trent by the king of Spain, at the solicitation of the Pope, was not in the nature of a treaty stipulation with the court of Rome. The king of Spain did not, by their adoption, contract an obligation to enforce all their provisions in his dominions, in all places and at all times, until dispensed by the Pope from so doing. He retained the power to suspend the operation of portions of those decrees relating to the celebration of marriages in the remote settlements of new colonies, unprovided with churches or priests. The fact that marriages *per verba de præsenti* were usual in the remote parts of Louisiana, is proof that this power was exercised as to this colony.

By the Spanish law, children begotten after both parties know with certainty of the existence of an impediment to their marriage, are illegitimate. *Aliter*, as to children begotten while both, or one of the parties was ignorant of such impediment, or while a doubt existed in the mind of either as to the fact of any impediment.

By the laws of Spain, where a husband, during marriage, contracts a second marriage with a woman ignorant of the existence of the first, one half the *acquests* and gains will go to each wife; one half to the first wife, because the marital cohabitation did not fail through her fault; and the other half to the second wife, because, by virtue of her good faith at the time of her marriage, she is reputed a lawful wife, though the marriage be null, for the same reason that her issue is recognized as legitimate. The one half of the *acquests* and gains is a debt due to each wife by the husband, and his heirs can claim nothing until his debts are paid.

PATTON
*v.*
CITIES OF PHILADELPHIA AND NEW ORLEANS.

A PPEAL from the District Court of the First District, *Buchanan*, J.

The petitioners allege, that they are the only lawful heirs and representatives of one *Abraham Morehouse*, who died in the parish of Ouachita, in the year 1813, intestate; that on the 21st June, 1796, the *Baron de Carondelet*, then Governor of Louisiana, made a concession of land to the *Baron de Bastrop*, in the district of Ouachita, of twelve leagues square, which was duly located and surveyed; that their ancestor and one *Charles Lynch*, having become interested with the *Baron de Bastrop* in said concession, *Lynch* and the *Baron de Bastrop*, on the 14th May, 1805, transferred to their ancestor, by notarial act, in full for his interest in said concession, and for other claims and valuable considerations, four undivided tenths of the said twelve leagues square; that *Edward Livingston*, having become the proprietor, by judgment and assignment from *Lynch* and the *Baron de Bastrop*, of their six undivided tenths, petitioners' ancestor, on the 18th September, 1807, made an amicable partition of the said lands with *Livingston*, by which their ancestor became proprietor of the portion of said lands described in the act of partition; that *Stephen Girard*, late of the city of Philadelphia, claimed to be the owner of about two hundred and eight thousand acres of said lands, by titles derived from persons pretending to be the heirs or representatives of the said *Abraham Morehouse*, and by his will bequeathed to the city of New Orleans one undivided third of the said two hundred and eight thousand acres of land, and the remaining two-thirds to the city of Philadelphia; that the said cities set up title to the land, and pretend to be the owners thereof, by virtue of said bequests; and that their claims are injurious to the petitioners, rendering it impossible for them to dispose of their lands but at a great sacrifice. They pray for a judgment declaring them to be the only heirs of *Abraham Morehouse*, and, as such, entitled to all his title and interest in said two hundred and eight thousand acres of land; that the de-

PATTON
*v.*
CITIES OF PHI-
LADELPHIA
AND NEW OR-
LEANS.

fendants have no right, title, or interest in said lands; and for $1000, for damage sustained by petioners in consequence of the pretended claim of defendants. The mayor, aldermen, &c., of the city of Philadelphia, answered, through a curator *ad hoc*, "that they are in possession of certain lands in the parish of Ouachita, which they hold by good titles, as well as by prescription," but denied that they are of the extent and quantity stated in the petition. The mayor, aldermen, &c., of the city of New Orleans answered, that they are in possession of certain lands in that parish, which they hold by good title as well as by prescription. They deny all the other facts and allegations in the petition.

The facts on which the decision in this case turned, are stated in the opinion delivered by ROST, J. The plaintiffs claim under the marriage of *Morehouse* with *Eléonore Hook*. There was a judgment below in favor of the plaintiffs for two undivided eighths of the land described in the petition. The defendants appealed.

*Downs*, for the plaintiffs.   1st. The heirship of plaintiffs is not put at issue by the answer.   5 La. 405.   5 Mart. N. S. 343.   1 La. 113, 283.   4 La. 328, and other cases.   Dig. p. 498.

2d. Plaintiffs are required to prove the marriage under which they claim. The nullities of that marriage—the illegitimacy of the children, must be shown by the defendants, as well as the fact that the first wife was living at the time of the second marriage.   Philips Ev. vol. 1st, pp. 197–8.

3d. The contract before the commandant was a good marriage.   18 La. 318. 1 Brown's Civil Law, 50, 69, 70, 72, 74.   Arpin's case, 6 Mart. N. S. 328.   1 M. and C'.s Part. 451, 453,   Law 1, 5, 7;   468 Law 3, Tit. 4.   Story's Conf. of Laws, 77, 79, 108.   10 La. 65, 68.   The commandant states that he had authority and he exercised it, and in such cases his authority will be presumed.   No one can question it but his superiors.   2 Martin's History 15. 1 White's Recop. 269, 270, 272.   2 Ibid, 451, 455.   6 Peters 714, 729, Arredondo's case.   These general principles have been applied to marriages in our courts.   *Holmes* v. *Holmes*, 6 La. 470.

4th. If the marriage is defective, the act of 1807 cured it.   2 Moreau's Dig. 3.

5th. Though the first wife were living, still as the second was in good faith, she and her children had the rights of a legal marriage.   *Klendenning* v. *Klendenning et al.* 3 Mart. N. S. 438.   *Heirs of Morehouse* v. *New Orleans.* 18 La. 318.   Civil Code, arts. 119, 120.   5 Toul. 530.   4 Partida, tit. 13, law 1.

*Preston*, on the same side.

*G. Strawbridge*, for the appellant.   1. There never was any marriage between *Morehouse* and *Eléonore Hook*.   Poth. Cont. de Mar, vol. 1, Nos. 306, 441.   Duranton, Contr. de Mar, vol. 1, Nos. 354–5.   Toullier, Contr. de Mar, vol. 1, Nos. 654–5–7.   The contract on file is no more than a betrothal.   Part. 1, Feb. Sup. page 21, No. 2.   1 Poth. Nos. 23, 28, 48.   Ord. Council of Trent.   2d. There was no good faith; or, if there was, it ceased before the conception of plaintiffs.

*Soulé*, on the same side.

The judgment of the court was pronounced by

ROST, J.* This was a suit for the slander of a title unattended with possession, which the issue made by the defendants has changed into a petitory action.

---

* EUSTIS, C. J., having been of counsel in this case, did not sit on the trial.

The plaintiffs aver, that their ancestor, *Abraham Morehouse*, acquired, in 1805, four undivided tenths of all that grant of land made by the Spanish government to the *Baron de Bastrop*, in the District of Ouachita, on the 21st day of June, 1796 ; that they are his only lawful heirs, and representatives, and have never sold, or otherwise disposed of their rights to said lands; that the late *Stephen Girard* accepted transfers from persons pretending to be heirs or legal representatives of *Abraham Morehouse*, or to hold titles derived from those persons, to the extent of two hundred and eight thousand acres of said land, two-thirds of which the said *Stephen Girard* afterwards bequeathed to the city of Philadelphia, and the remaining third to the city of New Orleans; and that the municipal authorities of those cities set up and assert title to those lands, to the great damage and injury of the petitioners. They pray that a curator *ad hoc* be appointed to represent the city of Philadelphia ; that the defendants be cited to answer their petition ; and that, after due proceedings had, they may be quieted in their title against all claims and pretensions of the defendants, and that said defendants be adjudged to pay damages.

A curator *ad hoc* was appointed as prayed for, and the defendants answered that they were in the possession of certain lands in the Parish of Ouachita, which they held by good and sufficient title, as well as by prescription ; they further denied all other facts and allegations in the petition.

The court, of the first instance, gave judgment in favor of the plaintiffs for two undivided eighths of the land in controversy, and the defendants appealed. On the appeal the plaintiffs have prayed that the judgment be amended, and the whole land decreed to belong to them.

The material facts of the case are as follows : In 1790, *Abraham Morehouse* married *Abigail Young*, in the State of New York, and had two children by her. He subsequently came to the Spanish colony of Louisiana, gave it to be understood that he was a widower, and, in September, 1799, by an act passed before the commandant of Fort Miro, in the District of Ouachita, acting as a notary public, agreed to take as his wife, *Bléonore Hook*. The commandant states in the act, that it is passed before him in conformity with a custom sanctioned by the government, on account of the want of spiritual assistance, and that the marriage is to be solemnized before the church on the first opportunity.

*Abraham Morehouse* declares himself, in the act, to be the widower of *Abigail Young*, and stipulates with *Eléonore Hook* and her curator, the Chevalier *Danemours*, that the rights of the children of this and of the preceeding marriage shall be the same, whether those born from *the present second marriage* be born before or after its solemnization before the church, and whether or not the solemnization takes place. The daughter of the commandant testifies, that there was no priest at that time in the District of Ouachita ; that she was present at the celebration of the marriage before her father ; that the usual formalities were complied with ; and that immediate cohabitation followed, as was then the custom in the colony.

It was contended, in argument, that this was a contract *per verba de futuro*. As it was followed by cohabitation, the distinction is not material, a marriage *per verba de futuro cum copulá*, having all the legal effects of a marriage *per verba de præsenti*. Hubbard's Evidence of Succession, 38 Law Library, p. 218.

We incline to the opinion, however, that a contract *per verba de præsenti* was intended. The commandant of Fort Miro was no civilian, and, at this distance of time, the intention of his acts and the understanding which the parties inter-

*(margin note: PATTON v. CITIES OF PHILADELPHIA AND NEW ORLEANS.)*

PATTON
*v.*
CITIES OF PHILADELPHIA AND NEW ORLEANS.

ested had of them, are safer rules for their interpretation, than can be deduced from the form and the words of those instruments. *Clapier et al.* vs. *Banks.* 10 La. 68.

There is nothing in the objection, that the contract was passed before the commandant, acting as a notary public. This is believed to have been the style of all the civil acts authenticated by those officers, except the putting in possession of land under orders of survey.

As stated by the plaintiffs, the land in controversy was acquired by *Abraham Morehouse*, in 1805. He died in 1813, his two wives being then alive ; and, many years after his death, *Stephen Girard* acquired those lands through *Abigail Young* and her sons, representing themselves as being the only legitimate wife and children of said *Abraham Morehouse.*

The first position taken by the plaintiffs' counsel is, that the heirship is not put at issue by the answer, and cannot be enquired into. However this might be, if the plaintiffs had introduced no evidence on the subject of the marriage of their ancestors, and rested their title upon proof of their *status* as legitimate descendants, the defendants cannot now be precluded from contesting the validity of evidence introduced by the plaintiffs themselves. The defendants having traced their title to *Andrew Morehouse*, the plaintiffs were bound to do the same. To that effect, they have thought it necessary to prove their legitimacy. The defendants have the right to rebut that evidence, and to invalidate, if they can, that portion of the title. There has been no surprise on either side, both parties seem to have considered that the battle was to be fought there, and the question of legitimate descent being fairly placed before us by the evidence, it is our duty, as far as necessary, to decide it.

On the merits, this cause presents the following legal questions for our consideration :

1st. Was the marriage of *Abraham Morehouse* and *Eléonore Hook* valid, as a civil contract, under the laws in force in Louisiana at the time of its celebration, although that marriage was not afterwards solemnized before the church ?

2d. If the marriage was valid, when did *Eléonore Hook* acquire such a knowledge of the previous marriage of her husband, as to put an end to her good faith ?

3d. While she continued in good faith, what right had each of the wives in the *acquests* and gains made by the husband ?

4th. What are the legal effects of the declaration made by *Eléonore Hook*, on the 19th September, 1813 ?

I. Marriages, such as that celebrated by the plaintiffs' ancestors, were included by the canon laws, with other imformal and secret marriages, under the general appellation of *clandestina matrimonia.* The council of Trent, 24 sess. chap. 1, recognized their validity on this emphatic language : " Tametsi dubitandum non est, clandestina matrimonia, libero contrahentium consensu facta, rata et vera esse matrimonia, quamdiu ecclesia irrita non fecit, et proinde jure damnandi sint illi, ut eos sancta synodus anathemati damnat, qui ea vera ac rata esse negant."

The reservation "quamdiu ecclesia ea irrita non fecit," is considered by commentators as an abuse of power, on the ground that, since those marriages were *rata et vera*, the Church could not, under the new law, put asunder what God had joined together. Be this as it may, the Church never annulled those marriages ; but the Council of Trent ordained that marriages contracted after its adoption should be null, unless they were celebrated before the priest of the

parish where the parties resided, or another priest, with the consent of the par-
rochus or the authorization of the bishop, and in presence of two or three
witnesses.

That Council was adopted in Spain by a real cedula of Philip II., bearing
date 12th August, 1564. Prompta Bibliotheca, verbo Concilium. At that time
Louisiana had not been discovered, and when, two centuries after, it became a
Spanish colony, we do not know that the Council of Trent was expressly in-
troduced here, or that it was ever published in every parish of the colony, during
the space of thirty days, as required by the dispositions of the Council itself.
We will, however, for the sake of argument, admit that the Kings of Spain
intended that their adoption of general councils should extend to all countries
which they might subsequently discover or acquire.

It would be an error to suppose that the adoption of the Council of Trent by
the King of Spain, at the solicitation of the Pope, was in the nature of a treaty
stipulation with the court of Rome, and that the King of Spain contracted by
it the obligation to enforce all its provisions, in all places and at all times, till it
pleased the Pope to dispense him from doing so. Such was not the understand-
ing of the high contracting parties.

The avowed object of the Council of Trent was, to reassert and embody the or-
thodox doctrines of the apostolic church, and to unite the christian sovereigns in
their support, against the reformers of Germany. The authority of Rome had,
for the first time, been successfully resisted, and the question of the adoption,
throughout christendom, of this Council, though, no doubt, in the eyes of the
Church, a question of right, was also a question of power. The Church con-
ceived it necessary to its existence and usefulness, that its supremacy in all spi-
ritual and some temporal matters should be acknowledged; but when submis-
sion was secured, that great institution was too wise to bring into disrepute the
moral power it possessed over the masses, by requiring the enforcement of the
provisions of the Council, when they might be productive of hardship and oppres-
sion, or shock the common sense, the habits and customs of nations.

When Clément VIII asked Henry IV of France, in exchange for the ab-
solution which he gave him, to cause the Council of Trent to be published in
his dominion, he added, *exceptis, si quæ forte absint quæ revera sine tranquillita-
tis perturbatione, executioni demandari non possint.*

When the kings of Spain caused the same Council to be published in the low
countries, the publication was made with many exceptions and reservations, as
to their rights and privileges, and the peculiar customs of those provinces.
*Margaret,* who, at that time, governed the Low Countries for the King of Spain,
informed the *Archbishop of Cambray,* of the reservations made, and added,
after mentioning them, "à tous lesquels droits et autres, semblables qui par çi
après vous seront, si besoin est, plus particulièrement touchée, sa dite Majesté
n'entend être dérogée par le dit Concile, mais pour le mieux effectuer et mettre
à due execution selon la qualité et nature de chacun pays et province à laquelle
l'execution doit être accommodée."

The successors of Clément VIII acknowledged with him, that sovereigns had
the power to regulate any portion of the laws of discipline established by gene-
ral Councils, when they deemed it necessary to the public good; and it is con-
ceded that by those reservations they retained the exclusive authority to decide
in each particular case, what was to be received or rejected, without the Popes
or Bishops ever having considered the exercise of that discretion as an encroach-

ment upon the rights and privileges of the Church. Françicot, Dissert. sur le Concile de Trente, pp. 28–29.

We conclude, therefore, that after the adoption of the Council of Trent, the kings of Spain retained the power to suspend the operation of that portion of it which relates to the celebration of marriages in the remote settlements of new colonies, yet unprovided with either churches or priests. In proof that this power was exercised in Louisiana, we have the historical facts that marriages *per verba de præsenti* were usual in the remote parts of this colony, and that one of the Spanish governors was married thus. We have, further, the declaration of the commandant who celebrated the marriage of the plaintiffs' ancestors, that, on account of their being no priest in the district of Ouachita, he was authorized by the government to do so. We deem that evidence sufficient, and consider this to be a proper case for the application of the rule laid down by the Supreme Court of the United States in the case of *Arredondo*, " that when the commandant says he had authority and exercised it, his authority will be presumed, and that no one can question it but his superiors." 6 Peters, 714, 729. 2 Martin's Hist. of Louisiana, 15.

This is not the only instance in which the operation of general Councils was suspended in Louisiana. Those establishing the tribunals of the inquisition and all other ecclesiastical courts, were never enforced here.

It was argued at the bar, that there can be no marriage in the dominions of Spain, without sacrament. But it cannot be denied that such marriages were valid before the Council of Trent, and one of its commentators explains in this manner, how the sacrament was administered in cases like the present :

" The marriages of catholics living amongst heretics or infidels, where the exercise of the catholic religion is not tolerated, though contracted *per verba de præsenti, without the presence of the priest,* are a real sacrament. I take it for granted that the civil law of the country approves this manner of contracting marriages. Necessity deprives the parties of the accidental minister, but they are themselves the essential ministers, and consequently, in countries *where they cannot have the presence of the priest,* and where the civil law does not imperatively require it, they are capable of administering the sacrament to each other." Dissert. sur le Marriage, p. 162.

He illustrates his argument by stating that, in cases of necessity, other sacraments, baptism for instance, may be administered by persons not in holy orders. Indeed, it was the opinion of *St. Thomas,* of Bellarmine, and of many general Councils, that, in all marriages, the parties are the ministers of the sacrament, and that the priest simply authenticates the contract, and vouchsafes to them the promise of Heaven that they will increase and multiply. This question we will not presume to decide.

It matters not, therefore, whether it be true, as stated by one of the witnessess, that *Abraham Morehouse* refused, subsequently, to solemnize his marriage before the priest. That marriage was valid without the solemnization, and *Eléonore Hook* was his lawful wife as long as she remained in good faith. We will state here that, had this marriage been contracted in any other manner not expressly authorized by the King of Spain, we would have come to a different conclusion.

II. The decision of the late Supreme Court in the case of *Klendenning v. Klendenning and others,* 3 Mart. N. S. 438, in relation to the good faith of the second wife, is a correct application of the Spanish law which regulated the

subject matter, at the time of the marriage of the plaintiffs' ancestors. By the law 1. title 13, part 4, it is ordained that, "if, after both parties know with certainty the existence of the impediment to their marriage, they beget children, those children will not be legitimate. Yet, if during the existence of such impediment, and while both or one of them was ignorant of it, they should be accused before the judges of Holy Church, and before the impediment was proved or the sentence pronounced, they should have children, those begotten *during the existence of the doubt, will all be legitimate.*"

Applying these principles to the case before us, the court is of opinion that, before what occurred on the arrival of *Andrew Y. Morehouse,* one of the sons by the first marriage, sometime in the year 1809, the evidence establishes nothing more than *the existence of a doubt.* The testimony of *Margaret Poor,* if it was unimpeached, does not prove that the statement of *Morehouse,* in relation to his previous marriage, when he was asked to solemnize the second before the priest, was ever made to his wife or in her presence. That evidence is not as positive as that of *Kilpatrick,* in the case of *Klendenning,* which the court did not deem sufficient. We confess, besides, that we doubt the veracity of this witness. The general reports current in the country, in relation to the existence of the first wife, are not brough thome to *Eléonore Hook,* otherwise than by the fact, that she at one time consulted the wife of the commandant in relation to them, and was advised not to believe them, because they were got up by the enemies of *Morehouse* for the sole purpose of annoying him. This does not fix upon her the *certain knowledge,* which the law contemplated. Notwithstanding those reports, *Morehouse* enjoyed public confidence, and was elected to the territorial legislature. The witnesses say that he was a kind and affectionate husband, and there is, in his letters to his wife, a truth of feeling and a warmth of affection, worthy of a better man. Under those circumstances, reports, which *Eléonore Hook* was advised, by the first lady in the land, not to believe, could not satisfy her that she had been deceived. But *Abigail Young,* left in New York to shift for herself and her young children, must have been under the influence of very different feelings, and ready to believe any report to the disparagement of her husband. When she first heard of his marriage, she should have apprized *Eléonore Hook* of her rights. After the change of government, she might have done so without difficulty. She did not see fit to take any steps in the matter, and left the second marriage undisturbed, till the arrival of her son in Ouachita, in 1809. Till then, we consider that the good faith of *Eléonore Hook* continued.

*Lucretia Morehouse,* one of the plaintiffs, has not made it certain that she was conceived during the continuance of the good faith of her mother; indeed, if the declaration of the latter should not be deemed legal evidence to prove the age of her children, the legitimacy of *Ann Maria,* another of the plaintiffs, is also left in doubt; but we abstain from deciding these questions. The opinion we have formed rendering such decision unnecessary.

III. We agree with the plaintiffs' counsel, that the second wife, and the children conceived during her good faith, have all the rights which a lawful marriage gives. We concur, on that subject, in the opinion of the late Supreme Court in the case of *Klendenning,* already cited. It is because *Eléonore Hook* had all the rights of a lawful wife, that the plaintiffs have no title or claim to lands acquired by their father during the existence of the two marriages. The plaintiffs have taken it for granted that there could not be two communities.

PATTON
v.
CITIES OF PHI-
LADELPHIA
AND NEW OR-
LEANS.

This is an error; the laws of Spain recognize in such cases *two entire communi-ties*. As the wife, under those laws, forfeits her share of the *acquêts* and gains when she is guilty of adultery, so the husband forfeits his share when he has two wives living, and each of the wives takes the undivided half to which the law would entitle her, if she was alone. Paz, in his 61st Consulta, class 9, states the law as follows, in a case identically the same as the present :

"Out of the *acquêts* and gains the debts must be paid, because what the parties owe during the marriage cannot form a part of the *acquêts* and gains, and belongs to the creditors. The balance, after paying the debts, must be divided between the two wives, without any portion of it going to the succession of the husband. The reason of this is that, by the laws of this realm, one-half of the *acquêts* and gains belongs to the first wife, although they have been made by the husband. Lib. 5, Nueva Recopilacion, tit. 9, l. 1–6. And although the second law of this title requires the cohabitation of the wife with the husband, in order that she be entitled to her share, yet as the marital cohabitation has not failed through her fault, but, on the contrary, through the fault of her husband who abandoned her, she is not to loose her rights on account of the fault and misconduct of her husband. *Imputari non debet ei per quem non stat, si non faciat quod per eum fuerat faciendum.* De Reg, Jur. 6 reg. 41.

"To the second wife the other half is due, because, by virtue of her good faith at the time of her marriage, she is reputed a lawful wife, for the same reason for which the law recognizes her issue as legitimate. This is affirmed by Covarruvias in Epit., p. 2, cap. 7, sect. 1, no. 7 ; Antonio Gomez, l. 50 de Toro, no. 77 ; and Molina de Just. tract. 2 disp. 433 ; who all agree that it is the common opinion of the doctors of the law that a woman, marrying in good faith, although the marriage may be null, is entitled to one half of the *acquêts* and gains. From which it results that one-half goes to each of the wives, and that the husband deceiving the second and doing a grievous wrong to the first, refuses unjustly to either the share which belongs to her ; and *that he is bound to satis-fy both out of every thing he possesses*, because the law favors those who are deceived against those who deceive them. *Cum deceptis et non decipientibus jura subveniunt.* In taking from the father's succession those *acquêts* and gains, no wrong is done to the inheritance or the legitimate portion of his children, because this is a just debt which he owes to his two wives, and the thing which the father owes is not inherited by his children, but taken by his creditors, as their own." Paz, Consultas Varias, pp. 483–4.

The lands claimed in this suit formed part of the *acquêts* and gains, and, at the death of *Morehouse*, the title to them vested in his two wives, each for one undivided half, to the exclusion of the plaintiffs. If, therefore, they have now any right to exercise upon these lands, it must be derived from the declaration of *Eléonore Hook*, made before the parish judge of the parish of Ouachita, on the 19th September, 1813. That declaration is in these words :

IV. "The declaration of *Eléonore Morehouse*, late widow of *A. Morehouse*, deceased, which declarant says, that she claims no part of the succession of the said *A. Morehouse*, but claims such property *as is in her own right ;* also as natural tutrix to her minor children, claims what property *is in the right of the said minor children."*

What did she mean by property *in her own right ?* The marriage contrac, states "que la dite demoiselle n'apporte en mariage au dit sieur *Morehouse,* que ses hardes, linge, bijoux, bagues et joyaux." She was a destitute orphan, lately arrived from Maryland under the care of the *Chevalier Danemours.*

The marriage contract also states that *Morehouse* resided, at that time, on *one of his plantations* in the district of Ouachita. It is proved that, immediately after the marriage, they went to reside on that plantation, and that subsequently *Morehouse's* land speculations caused him to make frequent voyages to New Orleans. The letters which he wrote to his wife on those occasions, show that there was a large stock attached to the plantation; that he was raising crops of cotton; and that he had erected upon it, during his marriage, *farm buildings*, a *new gin*, and *a dwelling house*. That plantation continued to be his homestead as long as he lived, and the plaintiffs' main witness states that, after his death, *Eléonore Hook* was always ·called the widow *Morehouse*, *and lived upon the same plantation where they resided during marriage*.

A deed of trust, found in the record, executed in her favor by one *John Miller*, in October, 1811, shows that she had sold him a tract of land, (whether this ·was the other plantation of *Morehouse*, is not material,) for the sum of $6,405, bearing interest, and payable to her in ten ·equal annual installments. In less than two years after this *Morehouse* had died, and one of the sons by the first marriage, in his own right and as curator of absent heirs, had been put in possession of the property considered as belonging to the succession, by the judge of the Court of Probates. The judge states in the order that, from the situation of the estate, it has been impracticable to make an inventory of any thing but of some moveable effects.

This putting in possession took place on the 5th October, 1813, fifteen days after the date of the declaration of *Eléonore Hook*, and the judge states that it met with no opposition from her.

The parties claiming adverse rights under the two marriages stood at that time, in this manner: *Eléonore Hook* was in possession of the plantation with all the buildings and improvements made at the expense of the community, and all the slaves, teams, stock and farming utensils attached to it, whether acquired before or during marriage. She had besides, a claim of over $6,000; secured by a deed of trust upon another tract of land, which had been sold by her with the authorization of her husband; that plantation and that claim were what she meant by property standing in her own right. Dotal or paraphernal property, she had not.

*Abigail Young* and her children, on the other hand, had taken for their share a few moveables not attached to the plantation, and the waste lands forming the four-tenths of the *Bastrop* grant. It was moreover stated by the plaintiffs' counsel, that *Morehouse* was very much in debt when he died, and that a great part of those lands had been sold to liquidate his succession.

Viewed with reference to this state of facts and the situation of *Eléonore Hook* under it, her declaration cannot be construed into a renunciation of the community. After intermeddling in the affairs of the succession, as she did, after retaining all the most valuable and the only productive portion of the property, and leaving the other parties to pay the debts, she did not renounce the community, and her declaration cannot be considered otherwise than as a receipt and acquittance for her share of it. It was so understood by all parties at the time. She let *Abigail Young* and her sons take possession of some moveable effects and of the waste lands, without opposition, and they have never disturbed her in the enjoyment of the property she retained. The family raised by her to adorn Louisiana, as observed by counsel, was supported and educated out of the income of that property; that income has enabled the

to live ever since in comfort and affluence. The wild lands taken by the other parties have remained unproductive, and it is to this day a serious question whether *Abraham Morehouse* had any title to them. The attempt to invalidate, at this time, an arrangement so long respected, so faithfully executed, and so advantageous to the plaintiffs, cannot be countenanced by this court. If it were set aside, justice would require that *Eléonore Hook* should account to the heirs of the first marriage, for the property she received, and the fruits it has produced. As far as the evidence enable us to judge, she retained all the proper estate of *A. Morehouse*; and if the plaintiffs have any claim, as heirs of their father, it is against her they must exercise it. When she stated in her declaration, that she claimed the property *that was in the right of her minor children*, she probably meant, as in her own case, property which had been purchased in their name by their father, and which it does not appear that the other heirs ever claimed from them. If she did not mean this, her children were without any rights, except those they might have to a share of the proper estate she retained.

For the reasons assigned, it is ordered and adjudged that the judgment of the District Court be reversed; that the defendants be for ever quieted in their possession and title against all claims and pretensions of the plaintiffs; and that the said plaintiffs pay the costs in both courts.