Brinkerhoee, C. J.
This is a petition in error, in the nature of a bill of review, filed in the district court of Cuyahoga county, to reverse a decree of that court, and reserved for decision by this court.
The original case was abillin chancery, filed in the common pleas of Cuyahoga county, by Eliza Duncan, now defendant in error, against Robert Duncan, now plaintiff in error, and others, alleging that she is the widow of Alexander Duncan, deceased; that said Alexander died seized of certain real estate described; and praying the assignment to’ her of dower therein. The been determined in the com *146 mon pleas, was taken, by appeal, to the district court, which court ■decreed dower to Eliza, as prayed for in her bill. To reverse this ■decree, this petition is prosecuted.
The facts of the case, on which this decree was based, as clearly •appear from the bill, answers, exhibits, and testimony, are substantially these:
Alexander Duncan, a native of Ireland, was married in that country. He abandoned his wife, came to this country, bringing with him two sons (of whom the plaintiff *in error is one), the only offspring of such marriage, and settled at Cleveland, in this state. Soon afterward, the complainant below, Eliza, who had been brought up and lived in the same neighborhood with Alexander Duncan, in Ireland, and well knew both him and his wife, as well as the fact of his marriage, came over the water to Cleveland, .at his request, and began to cohabit with him as his wife, under an ■agreement or understanding that, as soon as he could procure a divorce from his wife left behind in the old country, he would marry her, Eliza. He introduced and spoke of her as his wife, and she passed among the neighbors as such. Two children were the result of this adulterous connection; for the wife in Ireland still lived, and no divorce was ever obtained. Finally, news arrived (and which seems to have been true) of the death of the old wife, in a poor-house in Ireland. The promise that “ he would marry her ” ■was then renewed to Eliza; but no other marriage was ever celebrated, in any form, between them, and they continued to cohabit as before; and he, soon after, sickened and died.
The district court having, on this state of facts, decreed dower to Eliza, the sole question made by this proceeding in review is, whether a contract to marry in the future, followed by cohabitation as .husband and wife, is, per se, a marriage f
The proof of some of the most important of the facts above mentioned, rests mainly upon declarations made by Eliza, after the death of Alexander Duncan; and it is objected that evidence of this kind is unreliable and unsatisfactory. This is often and perhaps ■ordinarily so; but it is not always, or necessarily so, nor is it so in this case. She had ample means of knowing as to the facts of which she spoke; she made the declarations deliberately and repeatedly, under circumstances rebutting all suspicion of fraud or circumvention ; and if they were otherwise, she had every apparent interest so to declare. The declarations *of a party, made under such *147 •circumstances, often constitute the strongest and most satisfactory •evidence.
We desire that it shall be distinctly noticed, that this ease presents no question as to the validity of a marriage contract (otherwise than in accordance with the provisions of our statutes on that subject),per verba depreesenti, as if, the parties being competent to ■contract the relation of marriage, the man shall say, in the presence ■of witnesses, “ I hereby take you for my wifeand the woman shall say, “ I hereby take you for my husband.” The facts of the ■case make no such question ; and we leave it where we find it.
Nor is this a question as to the presumption of a marriage from reputation; or from circumstances, such as cohabitation, holding each other out as husband and wife, and the like. Such presumption, in the absence of evidence to rebut it, is often and properly made. But the question, as before stated, is simply this, whether a contract to marry per verba de futuro, followed by cohabitation as husband and wife, is in itself a marriage? For, in this case, the evidence of the fact is clear and explicit, and there is no room for presumption.
The idea that a contract for a future marriage, followed by cohabitation as husband and wife, is itself a valid marriage at common law, seems to have obtained curreney on the credit of remarks made by several elementary writers of distinguished learning and ability, and by certain judges of high character, speaking by way ■of obiter dicta, in cases in which this question was really in no way involved. But the better opinion now seems to be, that these remarks are unsupported by any case actually adjudicated and entitled to be considered as authoritative; and that such a contract never was a good marriage at common law, either in this country -or in England; and the mistaken doctrine seems to have originated, •either in the inadvertent confounding of what might, in the absence of rebutting evidence, be good presumptive evidence of a marriage, =*with marriage itself; or from the fact that such a contract per verba de futuro, followed by cohabitation, was one of which the ■canon law, as administered by ecclesiastical courts in England, until restrained by statute, would enforce the specific performance.
Chancellor Kent (2 Com. 87) says: “ If the contract be made per ■verba depreesenti, and remains without cohabitation, or if made per ■verba de futuro, and be followed by consummation, it amounts to valid marriage in the absence of ail civil regulations to the con *148 trary, and which the parties (being competent as to age and consent) can not dissolve, and is equally binding as if made in facie' ecclesice.” In support of this j>roposition he cites no authority.
Mr. G-reenleaf, in his work on Evidence, vol. 2, sec. 460, states the same doctrine in the same language, and cites Kent Com. 87; Fenton v. Reed, 4 Johns. 52; and Jackson v. Winne, 7 Wend. 47. Now, neither of these cases sustain the doctrine of his text The former was a case simply where marriage was presumed, in the absence of evidence to the contrary, from circumstantial evidence, such as cohabitation, reputation, acknowledgment of the parties, etc.; and the latter case was one of marriage per verba de prcesenti.
The same doctrine of marriage per verba de futuro is recognized in the remarks of Chief Justice Boyle, in Demarsely v. Fishley, 3 A. K. Marsh. 369, and in those of Cowen, J., in Starr v. Peck, 1 Hill, 270. But neither of those cases involved this question, and the remarks of those learned judges wore, therefore, incidental, and outside of the cases under consideration before them.
Bouvier, in his Institutes, vol. 1, p. 110, lays down the same doctrine as Kent and Greenleaf, in the same language, and cites Kent and Greenleaf ubi supra, Fenton v. Reed, and Jackson v. Winne, before referred to; and also Cram v. Burnham, 5 Greenl. 213; Hantz v. Sealy, 6 Binn. 405, and Bac. Abr., Marriage, B.
Cram v. Burnham was a suit, by Cram, upon a promissory note *given to his protended wife, with whom he was cohabiting as a wife, but, as the proof showed, really in a state of adultery. The court, in deciding the case, say, that if the proof had stopped with the-proof of cohabitation, a marriage might have been presumed ; but as the proof rebutted the presumption of mamage arising from the-fact of cohabitation, the plaintiff could not recover in his own name, and gave judgment against him. And in so far as the case has. any bearing upon the question before us, its authority is against,' rather than in favor of, the proposition which it was cited to sustain. Hantz v. Sealy is equally far from sustaining the doctrine in-support of which it is cited, except as to .the validity of a marriage-by words of contract in the present tense. Marriage or not, was•che issue in the case. The words proved, on the part of the man, wore, “ I take you for my wife;” and the woman, being told that if she would say the same thing, the marriage would be complete, answered, “ To be sure he is my husband, good enough.” The court held that these were not words, on the part of the woman *149 tit least, of present contract, but had reference to the past, and did not constitute a marriage. The citation from Bacon’s Abridgment is this : “A contract in futuro, as, I will marry you, etc., may bo enforced in the spiritual court, but such contract either party may release; also, if either party marry another person, such second marriage dissolves the contract.” This citation, so far from supporting the proposition of Bouvier, goes only to show the correctness of the distinction above mentioned, to wit, that such a contact is no marriage, but it is only a contract which might, at one time in England, have been enforced in the spiritual courts, and for a breach of which the law now gives a remedy in damages.
Blackstone (1 Com. 439) says: “Any contract made per verba de prcesenti, or in words of the present tense, and in the case of cohabitation, per verba de futuro also, between persons able to contract, was, before the late act, Adeemed a valid marriage to many purposes; and the parties might be compelled in the spiritual courts to celebrate it in facie ecelesice.” What these “ many purposes,” for which a marriage per verba de futuro was valid, were, does not very clearly appear ; and, whatever they may have been, it seems now to be pretty-well settled that they did not embrace a right to dower on the part of the wife, nor the right to administer on her estate, or to her property, on the part of the husband, nor the legitimacy of offspring, nor the avoiding of a subsequent marriage pending the first. 2 Bright on Husband and Wife, 397. In Jewell v. Jewell, 17 Peters, 213, the Supreme Court of the United States was equally divided on this question; and the remarks of "the court in Patton v. Philadelphia and New Orleans, 1 La. Ann. Rep. 98, are obiter.
We have been cited to no case, and we can find none, decided either in England or in the United States, in which such a marxiage as this is claimed to be has been held valid. On the other hand, the well-considered case of Cheney v. Arnold, recently decided unanimously by the court of appeals of New York, 15 N. Y. (1 Smith,) 345, is directly in point against it. That was an action for the recovery of real estate by a husband, in right of his wife, who claimed as heir to her deceased father. She was the fruit of a cohabitation following a contract to marry per verba de futur'o. It was a question of legitimacy only. The court, after a somewhat ■elaborate review'of the whole subject, disapproved of the dictum *150 of Cowen, J., in Starr v. Peck, before cited, and held such contract, to be no marriage in fact or at common law.
The Queen v. Millis, 10 Clark & Finnelly, 534, was a case inu the House of Lords, in error to the Court of Queen’s Bench in Ireland. The case arose upon a prosecution against Millis for bigamy, he having been married in Ireland, per verla de preesenti, by a Presbyterian minister according to the forms of that church, and, leaving the first, married another woman in England, in the face *of the church. The case turned upon the question, which was formally put by the House of Lords to the judges of Westminster Hall, for their opinion, whether the first marriage was valid as a marriage at common law. The judges, not having seats in the House of Lords, through C. J. Tindal, of the common pleas, gave a unanimous opinion against the validity of the first marriage. In this the law lords, Lyndhurst, Cottenbam, and Abingor, concurred. Brougham, Campbell, and Denman were-the other way. C. J. Tindal, and the six law lords above named, all delivered elaborate opinions, indicating much care and antiquarian research; and judgment was given against the validity of the-first marriage. But, while the opinion of the eminent jurists of the kingdom was thus nearly balanced as to the validity, at common law, of a marriage by words of present contract, and not in the face of the church, there seems to have been no difference of opinion among them as to the invalidity of a marriage per verla de futuro, though followed by cohabitation. All of them are careful to distinguish the case before them from such a case, and either tacitly or expressly to admit the invalidity of the latter. And all of them, except Lord Brougham, admit that a marriage not celebrated in the face of the church, whatever else it may have been good for, did not carry with it the incident of dower. And the-state of the law, as now understood in England, may be summed up as we find it in 1 Kerr’s Blackstone, 458: “Any contract made per verba de preesenti, or in'words of the present tense, and in the case of cohabitation per verba de futuro also, between parties able to contract, was, before the statute of George II., so far a valid marriage, that the parties might be compelled in the spiritual courts to celebrate it in facie ecclesioe. But these verbal contracts are now of no force to compel a future marriage; their only operation being to give the party who is willing to perform his promise a of civil action against the one who refuses to do so.”-
*151 *Finding ourselves, then, compelled by no preponderating force of authority to the adoption of a doctrine so loose as that which would be necessary to sustain the marriage claimed to exist in this, case, we are unwilling to do so. It seems to us that grave considerations of public policy forbid it; that it would be alien to the customs and ideas of our people, and would shock their sense of propriety and decency. That it would tend to weaken the public estimate of the sanctity of the marriage relation; to obscure the certainty of the rights of inheritance; would be opening a door to false pretenses of marriage, and to the imposition upon estates, of suppositious heirs; and would place honest, God-ordained matrimony and mere meretricious cohabitations too nearly on a level with each other.
We are of opinion that the decree of the district court ought to be reversed, and the original bill dismissed.

Judgment accordingly.

Scott, Sutlirr, Peck, and Gholson, JJ., concurred.