173 So. 185

**Succession of GIBSON et al.**

No. 33933.

March 1, 1937.

F. A. Blanchard and Chas. L. Mayer, both of Shreveport, for appellants.

D. H. Perkins, of Shreveport, for appellees.

ODOM, Justice.

George Gibson, a colored man, died intestate in the parish of Caddo on January 9, 1914, leaving an estate consisting of 158 acres of land which he had acquired as a homestead on February 3, 1889. He had two sets of children, five by a woman named Mollie Tyson, and six by Annie Tate. The first set of children, or those born to him and Mollie Tyson, were three sons, George, Artency, and Oscar, and two daughters, Lulu and Mary Jane. The second set, or those born to him and Annie Tate, were Mollie, Ollie, Wiley, Cora, Nathaniel, and Curley. Without again mentioning these children by name, we shall hereinafter refer to them as the first set and the second set. Some of the children of each set died prior to the date on which this suit was filed, leaving direct descendants.

.On September 30, 1921, the members of the first set who were then alive and the representatives of those who had died petitioned the court of Caddo parish to be recognized as the sole heirs of their parents, George Gibson and Mollie Tyson Gibson, and to be sent into possession of all the property of which they died possessed. They alleged that both their parents had died intestate in the parish of Caddo, the mother on July 12, 1878 (this should be 1898), and the father on January 9, 1914, leaving the following described property: N.½ of N. E.¼ and N.½ of N. W.¼, Sec. 19, T. 23 N., R. 15 W., "being the same.

property acquired by Gibson from United States as per patent recorded in Conveyance Book 47, page 458 of the records of Caddo Parish, Louisiana." Judgment as prayed for was read and signed on October 1, 1921.

This was an ex parte proceeding. No mention was made of the second set of children. Presumably, the first set of children took possession of this land, although the record is silent as to that.

The present suit was filed on June 18, 1935, by the second set of children or the representatives of those who had died. They alleged that they were the children, grandchildren, and sole heirs of George Gibson and Annie Tate, who were married in 1899, that their parents had both died intestate in Caddo parish, leaving an estate consisting of the N.½ of N. E.¼ and E. 30 acres of the N.½ of N. W.¼ of Sec. 19, T. 23 N., R. 15 W., containing 110 acres, which was community property valued at $1,600. This is part of the same land described in the petition of the first set of children. They alleged that in the year 1921 the first set of children, naming them, "had themselves declared to be the heirs of George Gibson and Mollie Tyson, his concubine and as such sent into possession of said above described property, all of which was null and void and without notice to your petitioners, who were young children about that time, and was an ex parte proceeding * * * not binding on your petitioners, but absolutely null and void."

They further alleged that the first set of children took possession of said land, were holding it, and refused "to recognize your petitioners as the sole heirs of their deceased father, George Gibson, and their deceased mother, Annie Tate Gibson, and as such entitled to the said land."

They prayed that each of the first children or the representatives of those who had died be cited and that petitioners be recognized as the sole heirs of George Gibson and Annie Tate Gibson, and as such sent into possession of all the property of which they died possessed; and, further, that the judgment dated October 1, 1921, recognizing the first set of children as the sole heirs of Gibson be annulled.

The first set of children, the defendants herein, answered, alleging that their father, George Gibson, and their mother, Mollie Tyson, were married in 1871 and that they were born of that marriage and therefore legitimate; that their mother died in 1898 and that four years later their father married Annie Tate, mother of the second set of children; that when their father married Annie Tate she had a living husband, Tom Tate, from whom she had not been divorced; that therefore their father's marriage to Annie Tate was null; and that the children born of that marriage, the second set, were adulterous bastards, incapable of inheriting. They further alleged that the land involved was acquired in 1889, during the existence of the community between their father and mother and that they had inherited the entire interest therein.

This, therefore, is a controversy between George Gibson's first set of children and his second set as to who inherited the

above-described tract of land. Neither the paternity nor the maternity of any of the children is in dispute. It is only the right of inheritance which is involved.

As to the precise points in controversy, the judgment rendered in the case leaves us in doubt as to what conclusions the trial judge reached. Evidently he did not prepare the judgment. Counsel now representing the respective sides seem to be in some doubt themselves, as each came into the case after the judgment was signed. The final decree reads as follows:

"That there now be judgment in favor of the plaintiff Wiley Gibson, Curley Gibson McCoy, Mollie Gibson, Nathaniel Gibson, Ollie Gibson Walters, Eliza and Leola Gilham, minor heirs of Cora Gibson Gilham, deceased, recognizing them as the sole and only heirs of Annie Tate Gibson and joint heirs, with defendants. Mary Gibson Caldwell, George Gibson, Artency Gibson Caldwell and the minor heirs of Oscar Fox Gibson, to wit: Finia, Valzoda, Mabry, Carl and Elnora Gibson, of the estate of George Gibson, deceased, and as such sent into possession of the following described land, to-wit:

"The North half of North East Quarter, and the East thirty-five (35) acres of the North half of the North West Quarter of Section 19, Township Twenty-three (23) Range fifteen (15) containing in all 110 acres more or less, located in Caddo Parish, Louisiana,

"hereby recognizing the plaintiff Wiley Gibson, Curley Gibson McCoy, Mollie Gibson, Nathaniel Gibson and Ollie Gibson Walters as owners of an undivided 1/15 each, and the minors Eliza and Leola Gilham 1.30 each.

"It is further ordered adjudged and decreed that Mary Gibson Caldwell, George Gibson, Artency Gibson Caldwell, and the minors of Oscar Fox Gibson, deceased, to-wit: Finis, Valzoda, Mabry, Carl and Elnora Gibson, be and they are hereby recognized as the heirs of Mollie Tyson Gibson and joint heirs with Wiley Gibson, Curley Gibson, Mollie Gibson, Nathaniel Gibson, Ollie Gibson Walters, and Eliza and Leola Gilham minor heirs of Cora Gibson, deceased, of the estate of George Gibson, deceased, and as such sent into possession of the following tract of land (then follows the same description of the land) in the following proportions:

"Mary Gibson Caldwell, George Gibson, Artency Gibson Caldwell, each an undivided 3/20 and the minors Finis, Valzoda, Mabry, Carl and Elnora Gibson, an undivided 3/100 each."

The defendants appealed from this judgment. Plaintiffs answered the appeal, praying that the judgment be so amended as to recognize them as the sole owners of the land in controversy.

The record brought up shows beyond question that George Gibson's first set of children were legitimate. There was filed in evidence a certified copy of a marriage certificate reading as follows:

"Certificate of Marriage"
"George Gibson to Mollie Crocket
"I, M. T. Embree, an acting and duly commissioned Justice of the Peace in and for the County of Lafayette and State of

Arkansas, do hereby certify that on the 10th day of November, 1871, in the County of Lafayette and State of Arkansas, I did duly join in Marriage Geo. Gibson of Caddo Parish, State of Louisiana aged 21 years and Mollie Crocket of the Parish of Caddo State of Louisiana aged 23 years, and then and there declared them to be Husband and Wife.

"Given under my hand this 16th day of November, 1871.

"M. T. Embree, J. P."

That certificate was duly recorded in the marriage records of Lafayette county, Ark., as shown by the following certificate: "State of Arkansas, County of Lafayette

"I, P. T. Landes, Clerk of the County and State aforesaid do hereby certify that the annexed and foregoing instrument, (Marriage Certificate) is a true and correct copy of the same as appears of Record in Record Book Vol. C, at page 229, Marriage Records of Lafayette County, Arkansas.

"In Testimony Whereof I have hereunto set my hand and affixed the seal of Lafayette County Court, this the 8th day of March, 1935.

"P. T. Landes,

"County Clerk, Lafayette County, Arkansas"

The undisputed testimony shows that Mollie Crocket and Mollie Tyson are one and the same woman; that Mollie Tyson married a man named Crocket, who died shortly after their marriage.

▆ It is not argued by counsel for plaintiff that the justice of the peace did

not in fact "join in matrimony" George Gibson and Mollie Crocket as the certificate shows. But counsel argued at the bar and says in his brief that the certificate is but an ex parte statement of a justice of the peace that he had performed a marriage ceremony, which is not sufficient proof that there was a legal marriage, assuming that the laws of Arkansas relating to the contract of marriage are the same as those of Louisiana. And he points out that in this state (and in the absence of proof to the contrary it must be assumed that the laws of a sister state relating to the particular point in controversy are the same as ours) no minister of the Gospel or other person shall celebrate a marriage unless he is authorized to do so by a license issued by proper authority (Civil Code, art. 104) and that the marriage must be celebrated in the presence of witnesses, that "an act must be made of the celebration, signed by the person who celebrates the marriage, by the parties and the witnesses." Civil Code, art. 105. He points out further that in this case there is no proof that a license was issued authorizing the justice of the peace to celebrate the marriage or that the celebration was in the presence of witnesses or that an act was made of the celebration, signed by the parties and the witnesses. Hence, it is argued that it is not shown that there was a legal marriage.

In this state justices of the peace may celebrate marriages. Civil Code, art. 103. That an Arkansas justice of the peace did "celebrate" the marriage of this couple is shown by the recitals of the certificate, the

verity of which is not challenged. The magistrate certified that he had "joined in marriage" George Gibson and Mollie Crocket and "declared them to be husband and wife."

This, then, was a ceremonial marriage. The parties were of age, able to contract, willing to contract, and did enter into a contract of marriage. Civil Code, art. 90. But it is argued that they did not contract "pursuant to the forms and ceremonies prescribed by law" because there was no license authorizing the justice of the peace to perform the marriage ceremony and no "act made of the marriage."

A full century before the present suit was filed this court said, in Holmes v. Holmes, 6 La. 463, at page 470, 26 Am.Dec. 482:

"Marriage is regarded by our law in no other light than as civil contract, highly favored, and depending essentially on the free consent of the parties capable by law of contracting. Our code does not declare null a marriage not preceded by a license, and not evidenced by an act signed by a certain number of witnesses and the parties; nor does it make such an act exclusive evidence of a marriage. These laws relating to forms and ceremonies, here regarded as directory to those alone who are authorized to celebrate marriages, are intended to guard against hasty and inconsiderate marriages in defiance of parental authority. Like all other contracts, it may be proved by any species of evidence not prohibited by law, which does not presuppose a higher species of evidence within the power of the party; and cohabitation as man and wife furnishes presumptive evidence of a preceding marriage."

In the case of Sabalot v. Populus, 31 La.Ann. 854, Mrs. Baptiste claimed that she was entitled to receive out of the proceeds of a sale the amount allowed by law to widows in necessitous circumstances. Her claim was opposed on several grounds, among them being "that the celebration of her marriage with Baptiste was not preceded by the license which the law requires." As to this contention, the court said:

"Were it so, the law relied upon is merely directory to those who are empowered to celebrate marriages, and its non-observance can not—of itself—affect their validity, when—as in this case—they are otherwise duly solemnized and contracted."

This holding was quoted with approval in Succession of Fortier, 51 La.Ann. 1562, 1598, 26 So. 554. To the same effect is the case of Landry et al. v. Bellanger et al., 120 La. 962, 45 So. 956, 15 L.R.A.(N.S.) 463, 14 Ann.Cas. 952. In State v. Trull, 147 La. 444, at page 447, 85 So. 70, 72, the court said:

"It has been decided, and repeated several times, that the requirement of the Civil Code that a minister of the gospel or justice of the peace shall have a special license for the performance of a marriage ceremony is only directory, and that a marriage that has been otherwise duly contracted and solemnized should not be deemed null for want of a special license."

Citing the above cases, and in addition thereto, Succession of Colwell, 34 La.Ann. 265.

Following this marriage ceremony George Gibson and Mollie Crocket (or Tyson) began to cohabit, and as a result of their cohabitation, five children, the first set, were born. The second set of children admitted that to be true, but their counsel argues that they are bastards for the reasons above set forth.

■ There is no merit in that contention. Their parents were joined together in what the magistrate evidently thought was marriage, for that is what he called it. He said he pronounced them husband and wife. If the magistrate thought they were husband and wife, we see no reason to doubt that the parties themselves thought so, too, especially in view of the fact that they were negroes and presumably slaves not more than six years before. If, by reason of that ceremony, they thought they were married and thereafter cohabited in good faith, the children born of that union were legitimate.

■ Counsel for plaintiff says there is no proof that they lived together as husband and wife or that they held each other out as such. There was no necessity, under the circumstances, for making such proof. Defendants did not rely upon circumstantial evidence to prove the marriage of their parents. The magistrate's certificate showed that they were married.

The land involved was acquired in 1889, as shown by the patent. It therefore fell into the first community, and when the mother of the first children died in 1898, they inherited an undivided one-half interest therein, subject to the usufruct of their father. After George Gibson's first wife died he married Annie Tate. That was a ceremonial marriage clothed with all the formalities prescribed by law. There were born of that marriage six children, the second set. The first set of children say that these latter were adulterous bastards because Annie Tate had a living husband from whom she had not been divorced. If she did, she could not legally marry. The record shows that she and Tom Tate were married in 1892. There is positive testimony that Annie's husband, Tom Tate, was alive when she married George Gibson, in fact, that he was alive in 1935, just before this case was tried. There is also strong circumstantial evidence that he was killed before his wife married again. The circumstantial evidence of Tom Tate's death must yield to the positive testimony that he was seen alive long after the date on which he was reported to have been killed. We hold, therefore, that there was a legal impediment to the marriage of George Gibson and Annie Tate.

But from this it does not necessarily follow that George Gibson's children born of his marriage to Annie Tate could not and did not inherit from him. If he and Annie Tate married in good faith, believing that there was no legal impediment to their marriage, that marriage produced its civil effects in favor of the parties and their children born of that marriage, according to the express provision of articles

117 and 118 of the Civil Code, which read as follows:

"Art. 117. *Putative Marriages*. The marriage which has been declared null produces nevertheless its civil effects as it relates to the parties and their children, if it has been contracted in good faith."

"Art. 118. Id. If only one of the parties acted in good faith, the marriage produces its civil effects only in his or her favor and in favor of the children born from the marriage."

Harrington v. Barfield, 30 La.Ann. 1297; Patton v. Philadelphia & New Orleans, 1 La.Ann. 98; Miller et al. v. Wiggins, 149 La. 720, 90 So. 109; Jermann v. Tenneas, 39 La.Ann. 1021, 3 So. 229.

▇ The testimony shows that George Gibson and Annie Tate had good reason to believe that Annie's first husband, Tom Tate, was dead when they were married. Here is what was proved:

Tom Tate and his wife, Annie, lived on a plantation near Red river, in Caddo parish. The manager of the plantation, a white man, sent for Tom and told him he had better leave. Tom went to his own house, told his wife that he had to leave, changed his clothes, went to the river, got into a skiff, and proceeded down the river. It was then late in the afternoon. Shortly thereafter gun shots were heard down the river. The skiff in which Tom embarked was found later, but not Tom's body. It was generally reported and generally believed that he had been killed, and he probably was. But, as we have stated, two colored witnesses swore at the trial that they saw him years later, one in 1913 and one in 1935. Certain it is that no one in that community saw or heard of him for a number of years, until long after Annie had married George Gibson. Annie evidently believed that her husband had been killed, for she soon left that vicinity and went to her people in Arkansas. George Gibson, then a widower, knew all this as well as Annie and the others did.

▇ These circumstances were sufficient, we think, to cause both George Gibson and Annie Tate to believe that Annie's first husband was dead. We think they were both in good faith, and that being true, it follows as a matter of law that their marriage produced its civil effects, both as to them and as to their children.

▇ Therefore, when George Gibson died intestate in 1914, the property of which he died possessed was inherited by the five children of his first marriage and the six of his second marriage, eleven in all, share and share alike. The law makes no distinction between them as to their right of inheritance from their father.

As to the land involved, if it belonged to the first community, the children of the first marriage, that is, the first set, inherited their mother's one-half interest therein, share and share alike, to the exclusion of the second set of children. So that the first set of children inherited 5/11 of their father's one-half, or 5/22 of the whole, plus their mother's one-half, 11/22 of the whole, or 16/22 of the entire estate.

If, on the other hand, the land belonged to the second community as alleged by plaintiffs, the second set of children would

receive their pro rata of their father's one-half interest, or 6/22 of the entire estate, plus their mother's one-half interest.

There is a dispute between the first set and the second set as to whether the land belonged to the first or the second community, and here is the ground for the dispute. It is conceded that the land was acquired originally by George Gibson as a homestead in 1889, during the existence of the first community. But in January, 1912, after George Gibson married Annie Tate, he sold the land to the Vivian Bank for $110, according to the deed, and in November of the same year the bank sold it back to him for the same consideration. So that the second set of children say that inasmuch as the bank sold the land to George Gibson in 1912 while their mother was living, it became the property of the second community and that at the death of their mother and father they inherited the entire property, this being upon the contention that the first set of children, being bastards, inherited nothing from their father.

■■ It is important, therefore, to determine whether the land belonged to the first or the second community. That it was acquired originally by George Gibson as a homestead in 1889, which was during the lifetime of Mollie Tyson, is not disputed. And since we hold that George Gibson and Mollie Tyson (or Crocket) were legally married, it follows necessarily that the first set of children inherited an undivided one-half interest therein upon their mother's death. They owned that interest when George Gibson made the so-

called sale to the Vivian Bank. So that George Gibson could sell only his undivided one-half interest in the land and the bank could convey back to him no greater interest than it had acquired. Therefore, only an undivided one-half interest in the property could have fallen into the second community, even if the so-called bank transactions amounted in law and fact to sales, which is disputed.

The first set of children contend that these transactions, while purporting to be sales, were never intended to be such; that Gibson intended to turn the land over to the bank merely as security for a loan of $110, and that the bank intended to receive and hold it as such until the debt was paid; that the debt was paid in November of the same year, whereupon the bank retransferred the land to Gibson.

■ If that be true, title did not pass and parol testimony was admissible to show the intent of the parties, insamuch as the rights of third parties are not involved. It was so held in Becker v. Hampton, 137 La. 323, 68 So. 626, where many of the earlier cases on the same subject were cited and reviewed, and in Ford v. Parsons, 142 La. 1093, 78 So. 128, where the court again cited and approved the earlier cases.

■ This point was not raised by the original pleadings in this case, but after judgment counsel for the first set of children filed a motion for a new trial on the ground that they had just learned that Mr. J. D. Houston would testify that he was connected with the Bank of Vivian at the time the transactions between George

Gibson and the bank took place, and that to his personal knowledge the purported sale by Gibson to the bank was not intended to be such; that the records of the bank show that on January 15, 1912, George Gibson borrowed $110, secured by mortgage; that the loan was paid on November 4, 1912, and that thereupon the bank executed what purports to be a deed conveying the land back to Gibson for $110, the amount of the loan; that the bank secured and held title to the land only as security for the debt, which was the custom of the bank in those days. Counsel attached to their application for a new trial the affidavit of Mr. Houston.

Under the showing made, the judge should have granted a new trial for the purpose of hearing testimony touching the question whether the parties by executing the two purported deeds intended to transfer title, or whether it was intended that the land be held by the bank as security for a loan.

For the reasons assigned, the judgment appealed from is set aside. And it is now adjudged and decreed that the first set of children and their descendants own the undivided one-half interest in the land involved which is their inheritance from their mother, Mollie Tyson Gibson; and that the eleven children of George Gibson (five by his first wife and six by the second) inherited his property share and share alike, and that the said property is now owned by the said eleven children or their descendants.

It is further ordered that the case be remanded for a new trial solely as to the question whether the above purported sales of George Gibson to the Vivian Bank and by the bank back to Gibson, the parties intended to transfer title or whether they intended that the land should be held by the bank as security for a loan. It is further ordered that one-half the cost be paid by plaintiffs and one-half by defendants.

O'NIELL, C. J., absent.